Erwin J. Shustak (SBN 119152)
eshustak@shufirm.com
Katherine S. Bowles (SBN 272704)
kbowles@shufirm.com
SHUSTAK REYNOLDS & PARTNERS, P.C.
401 West "A" Street, Suite 2200
San Diego, CA 92101
Telephone:  (619) 696-9500
Facsimile:   (619) 615-5290

*Attorneys for Plaintiffs Diana Wolf and Rahamin Suares*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANA WOLF, an individual, and RAHAMIN SUARES, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>TSG WEALTH MANAGEMENT, LLC, a Nevada limited liability company,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. **DECLARATORY JUDGMENT AS TO 18 U.S.C. § 1836**<br>2. **DECLARATORY JUDGMENT AS TO EMPLOYMENT-RELATED AGREEMENTS**<br>3. **IMPOSITION OF UNLAWFUL TERMS AND CONDITIONS OF EMPLOYMENT** |

1. Plaintiffs Diana Wolf and Rahamin Suares ("Plaintiffs") hereby complain and allege against Defendant TSG Wealth Management, LLC ("Defendant" or "TSG") as follows:

## THE PARTIES

2. Plaintiff Wolf is a FINRA registered representative. Ms. Wolf has been employed by TSG as a Client Relationship Manager since October 2019. During this time-period, Ms. Wolf was also an independent contractor and registered representative of Wells Fargo Advisors Financial Network, LLC ("WFAFN"), a FINRA registered broker dealer. Ms. Wolf lives in Orange County, California, and worked out of TSG's Long Beach, California office.

3. Plaintiff Suares is a FINRA registered representative. Mr. Suares has been employed by TSG as a Managing Director since October 2019. During this time-period Mr. Suares was also an independent contractor and registered representative of Wells Fargo Advisors Financial Network, LLC ("WFAFN"), a FINRA registered broker dealer. Mr. Suares lives in Los Angeles County, California, and worked out of TSG's Long Beach, California office.

4. Defendant TSG is a Nevada limited liability company with its principal place of business in Long Beach, California. TSG operates as a WFAFN brokerage office through its partners Mark Schulten and Allen Schreiber, who are WFAFN licensees. As part of their operation of TSG as a WFAFN brokerage office, WFAFN provides TSG back-office functions and administrative support in exchange for a portion of TSG's revenue. Financial advisors who work for TSG are required to be affiliated with WFAFN as independent contractor and registered representatives. At the time TSG became a WFAFN brokerage office, its advisors managed $4 billion in customer assets.

## JURISDICTION AND VENUE

5. The court has jurisdiction over this matter under 28 U.S.C. § 1331. Plaintiffs' claims for declaratory relief arise, in part, under the Defend Trade Secrets

Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, as Plaintiffs seek a declaration that they did not violate the DTSA; that Defendant otherwise has no valid claims against Plaintiffs under that statute; and that Defendant has no basis to obtain temporary injunctive relief, permanent injunctive relief, or other relief against them. This Court has supplemental jurisdiction over the second and third causes of action under 28 U.S.C. § 1367.

6. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because Defendant actively and regularly conducts business in this district and a substantial portion of the events and/or omissions giving rise to Plaintiffs' claims occurred in this district. Among other things, Plaintiffs were employed by Defendant in this judicial district and they entered into employment agreements with Defendant in this judicial district.

**FACTUAL BACKGROUND**

7. Plaintiffs are experienced financial advisors who collectively have almost 50 years of experiences in the financial services industry. Prior to working for TSG, Plaintiffs worked as financial advisors for Wells Fargo Advisors and were affiliated with a team known as The Schulten Group led by Schulten and Schreiber.

8. In October 2019, The Shulten Group left Wells Fargo Advisors, moved to Wells Fargo's independent brokerage platform WFAFN, and formed TSG Wealth Management, LLC to act as a WFAFN brokerage office.

9. After the team relocated to the independent platform, Plaintiffs became employees of TSG. On or about October 18, 2019, Plaintiffs each signed a "TSG Wealth Management Employment Agreement." ("Employment Agreement"). The Employment Agreement set forth the terms of Plaintiffs' employment, including their salary, benefits, and other terms of employment, and designated Plaintiffs as at will employees. The Employment Agreement is attached hereto as Exhibit 1.

10. In addition to standard employment terms, the Employment Agreement Plaintiffs were required to sign in 2019 also includes an unlawful non-disparagement clause. This provision states: "Non-Disparagement. Following termination of

employment for any reason, Employee and the Company agree not to make to any person, or any prospective employer of Employee, any statement that disparages the other Party, including but not limited to the Employee, the Company, Owners, or any of its employees."

11. This non-disparagement provision violates California Government Code § 12964.5, that says it is an unlawful employment practice for an employer, as a condition of employment, to require an employee to sign a non-disparagement agreement or other document that "purports to deny the employee the right to disclose information about unlawful acts in the workplace, including, but not limited to, sexual harassment."

12. This non-disparagement provision also violates Rule 21F-17 of the Securities and Exchange Commission, which states that "no person may take any action to impede an individual from communicating directly with the [SEC] about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement."

13. Nowhere in the Employment Agreement does it say an employee may disregard the non-disparagement provision for purposes of disclosing unlawful acts in the workplace or communicating with authorities about potential unlawful actions, and therefore the Employment Agreement violates state and federal law.

14. The Employment Agreement also includes an overbroad and unlawful confidentiality provision. The provision states: "Employee covenants and agrees that he/she will not, at any time, except in performance of his obligations to the Company hereunder or with the prior written consent of the Owners, directly or indirectly, disclose any Trade Secret or Confidential Information that he may learn or has learned by reason of his employment with the Company and will not use any such information to the detriment of the Company."

15. The Employment Agreement defines "Confidential Information" as: "information not previously disclosed to the public or to the trade by the Company's

management with respect to the Company's business plans, prospects and opportunities, the identity of donors, intellectual property, systems, procedures, research, manuals, confidential reports, marketing plans or strategies, and financial information."

16. The Employment Agreement also extends the confidentiality restrictions into perpetuity: "Employee understands and agrees that the rights and obligations set forth in this Section 5(a) are perpetual and, in any case, shall extend beyond the Employment Period and Employee's employment hereunder."

17. Not only does this overbroad definition of confidential information violate state and federal law, including Business and Professions Code § 16600 and California public policy, as it effectively acts as a non-compete and non-solicitation clause, it also violates Plaintiffs' rights pursuant to the Protocol for Broker Recruiting.

### *TSG Presents Further Unlawful Agreement to Plaintiff Wolf*

18. In December 2020, TSG presented Plaintiff Wolf with a new employment agreement titled "Financial Professional Employment Agreement" (the "FP Agreement"), and informed Wolf she must sign the FP Agreement by December 31, 2020. Plaintiff Wolf learned that if she did not sign the FP Agreement by that date, TSG would withhold her pay.

19. TSG did not offer Wolf any additional compensation or consideration to sign the new Agreement, and Shulten even confirmed, in writing, that the new Agreement provides the same compensation and benefits Wolf was already receiving.

20. The FP Agreement TSG presented to Wolf contains provisions that are unlawful under state and federal law. For this reason, Wolf did not sign the FP Agreement.

21. The FP Agreement includes a non-solicitation provisions that bars the departing employee for two-years after termination of their TSG employment, without any geographical limitation, from:

      (a) soliciting any TSG employee to work for or with the departing employee or to leave TSG;

      (b) soliciting any "supplier, service provider, customer, or other business relation of the Company to become a business relation of Employee;"

      (c) suggesting to "a business relation of the Company that the business relation should reduce or terminate the business relation's business or relationship with the company;" or

      (d) directly or indirectly providing "any financial services or sell[ing] financial service products to clients of the Company."

22. This provision is unlawful California law. California Business and Professions Code § 16600 prohibits contracts that restrain anyone from engaging in a lawful profession, trade, or business, and restrictive covenants of this type are unlawful pursuant to California public policy.

23. The FP Agreement also includes an unlawful "no disparagement" provision: "Employee shall refrain from making disparaging comments about other employees of Employer and/or the Employer, including the officers, executives, directors, members, shareholders, contractors, consultants, agents, subsidiaries, and affiliates of Employer."

24. As stated above, this non-disparagement provision is unlawful under California Government Code § 12964.5, as it purports to deny Plaintiffs the right to disclose information about unlawful acts in the workplace.

25. The FP Agreement also incorporates a four-page "Employee Confidentiality Agreement." This nondisclosure section bars, in perpetuity, an employee from using any identified "confidential information" for their own benefit or the benefit of a third party or disclosing or removing said "confidential information" from TSG's premises.

26. The definition of "Confidential Information" encompasses essentially all documents and information Plaintiffs use to perform their jobs as financial advisors,

and also covers information that is legally allowed to be taken and used pursuant to state and federal laws and pursuant to the Protocol for Broker Recruiting, as described below.

27. The FP Agreement defines "Confidential Information" as: "information relating to customers, clients, suppliers, investors, lenders, consultants, independent contractors and employees of Employer; customer and client lists, price lists and pricing policies; financial statements and information; budgets and projections; business plans; production costs; market research; marketing and sales strategies; processes and business methods; merchandising systems or plans, sources of supply technical information; pending projects and proposals; new business plans and initiatives; research and development projects; inventions, discoveries, ideas, technologies, trade secrets, know-how, formulae, designs, patterns, marks, names, improvements, works of authorship and other intellectual property; devices; photographs and digital images; computer software and programming; all other confidential information and materials relating to the businesses of Employer; and all notes, analyses, compilations, studies, summaries, reports, manuals, documents and other materials prepared by or for Employer containing or based in whole or in part on any of the foregoing (all of the foregoing, whether communicated in verbal, written, graphic, electronic or any other form and whether or not conceived, developed or prepared in whole or in part by the Employee."

28. Not only does this overbroad definition of confidential information violate state and federal law, including Business and Professions Code § 16600 and California public policy, as it effectively acts as a non-compete and non-solicitation clause.

29. After Wolf raised her concerns with TSG about the FP Agreement, they tentatively walked back their demand that she sign the FP Agreement, and suggested she provide proposed revisions. Instead of signing the FP Agreement, Wolf instead chose to seek alternative employment.

*Protocol for Broker Recruiting*

30. WFAFN, the broker dealer Plaintiffs were previously registered with, is a signatory member of the Protocol for Broker Recruiting (the "Broker Protocol"). The Broker Protocol is an agreement among participating firms that allows financial advisors who transition from one Broker Protocol member firm to another to take certain client information, including client names, addresses, account titles, email addresses and phone numbers ("Protocol Information"), with them without the threat of litigation from the prior firm. The transitioning advisor may then use that information to contact and solicit clients so long as the terms and conditions of the Protocol have been met.

31. The Protocol was borne out of an avalanche of trade secret litigation between the largest Wall Street firms, including Morgan Stanley, Smith Barney, Merrill Lynch, and UBS, in the 1990s through the early 2000s. When an advisor would leave one firm to join another, the prior firm would routinely file for a temporary restraining order or other emergency injunctive relief, claiming, among other things, that the basic client information to which the advisor had access during their employment constituted highly confidential, legally protected trade secrets. Firms would argue the client relationship belonged to the firm, and that client contact information was a legally protected trade secret. In seeking—and routinely obtaining—emergency injunctive relief, the prior firm's goal was to block the advisor's transition to the new firm or, at a minimum, buy time to convince clients not to move. That same firm, of course, would take the opposite position when recruiting new advisors and encourage them to transition their clients and assets into the firm.

32. Recognizing the absurdity of the situation, and seeking to reign in ballooning legal costs, Smith Barney, Merrill Lynch, and UBS formed the Protocol in 2004. Morgan Stanley (Smith Barney's eventual successor) and Wachovia Securities (now Wells Fargo Advisors) followed suit and joined the Protocol in 2006.

33. There are now more than 1,700 Protocol members, including FINRA broker-dealers and SEC and state-regulated Registered Investment Advisor firms.

34. The purpose of the Protocol was for firms to put client needs ahead of their own and allow financial advisors the freedom to move from one firm to another. According to the Protocol, its "principal goal is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ('RR') between the firms."[1]

35. The Protocol further states: "If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm. . . . The signatories to this protocol agree to implement and adhere to it in good faith."

36. The Broker Protocol includes a "good faith" provision, which confers full Protocol protections to a departing advisor in the event their prior firm alleges there were Protocol violations, so long as the advisor substantially complied with the terms of the Broker Protocol in good faith.

37. Acknowledging many Protocol member firms still include restrictive covenants in their employment agreements, the Broker Protocol website includes in its "Frequently Asked Questions" section a clarification regarding restrictive covenants in employment agreements: "What about the terms of my employment agreement? Many registered representatives have executed employment agreements containing terms prohibiting solicitation of customers or retention of customer lists. So long as the old and new firms are signatories to the Protocol and the registered representative substantially complies with its terms, the Protocol provides that the registered

---

[1] http://www.thebrokerprotocol.com/index.php/authors/read-the-protocol

representative shall not be liable to the old firm for retaining the information identified in the Protocol or soliciting clients on behalf of the new firm." https://www.thebrokerprotocol.com/index.php/faqs/.

38. The broad confidentiality provisions included in TSG's Employment Agreement not only violate state and federal law, by restraining Plaintiffs' ability to engage in their chosen profession and restricting their ability to report potential unlawful activities, they also fundamentally violate the terms of the Broker Protocol.

39. Plaintiffs continued to work for TSG until January 19, 2021, when they voluntarily resigned. Plaintiffs are now in the process of transitioning to LPL Financial, which is also a signatory to the Broker Protocol. As part of Wolf's resignation, she followed Broker Protocol procedures and invoked her right to the Protocol protections available to advisors who leave one Protocol firm for another.

40. Wolf intends to announce her new affiliation with LPL to her clients and solicit her clients using the Protocol list she compiled and retained. Suares also intends to announce his new affiliation with LPL.

41. In light of the restrictive covenants in TSG's Employment Agreement, and the unlawful FP Agreement TSG sought to have its employees sign, Plaintiffs face the real and imminent risk that TSG will seek an unlawful temporary restraining order or other injunctive relief against them and otherwise stifle their ability to engage in their lawful business and profession. Plaintiffs have brought this suit to protect their legal rights and allow them to continue conducting business without the threat of frivolous legal action by TSG.

## FIRST CLAIM FOR RELIEF

**(For Declaratory Judgment as to 18 U.S.C. § 1836)**

42. Plaintiffs restate and incorporate, by reference, each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

43. An actual controversy exists between Plaintiffs and Defendant. Based on the terms of the Employment Agreement Plaintiffs signed, Plaintiffs have good reason

to believe TSG will pursue litigation and injunctive relief against them pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") if they pursue alternative employment at a Protocol firm and invoke the protections of the Broker Protocol.

44. Plaintiffs contend that their right to invoke the protections of the Broker Protocol, including knowing and possessing Protocol Information and using that information to contact and solicit clients and announce their affiliation with a new firm: (1) does not constitute a misappropriation of Defendant's trade secrets or violation of the DTSA; (2) does not constitute a breach of any enforceable provision of Plaintiffs' agreements with Defendant; (3) does not constitute unfair competition; and (4) does not otherwise give rise to any claim that would entitle Defendant to obtain a temporary restraining order or preliminary or permanent injunctive relief against Plaintiffs.

45. Therefore, Plaintiffs seek a declaration from the Court holding that:

    a. Plaintiffs will not misappropriate any of Defendant's protectable trade secrets or violated the DTSA by invoking the protections of the Broker Protocol;

    b. Choosing to invoke the protections of the Broker Protocol does not breach any enforceable provision of Plaintiffs' agreements with Defendant and that any provisions of any agreements Defendant may rely upon in seeking to prevent Plaintiffs from using any client contact information are invalid and unenforceable;

    c. Defendant is not entitled to a temporary restraining order, preliminary injunction, permanent injunction or other injunctive or monetary relief against Plaintiffs if they choose to invoke the protections of the Broker Protocol.

## SECOND CLAIM FOR RELIEF

**(For Declaratory Judgment as to Defendant's Employment Agreements)**

46. Plaintiffs restate and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

47. An actual controversy exists between Plaintiffs and Defendant. Plaintiffs contend that the employment agreements Defendant has previously required them to sign, and the FP Agreement TSG presented to Wolf as a condition of employment, in whole or in part, are illegal, void, and unenforceable as against California public policy, and contain an unlawful covenant not to compete.

48. An employer may not lawfully make the signing of an employment agreement that contains an unenforceable covenant not to compete a condition of continued employment.

49. Defendant required Plaintiffs to sign an employment agreement that contains an unenforceable confidentiality clause and unlawful non-disparagement clause as a condition of their employment.

50. Therefore, Plaintiffs seek a declaration from the Court holding that:

    a. The Employment Agreement is illegal, unconscionable, void, and unenforceable in its entirety; and, alternatively,

    b. Those sections within the Employment Agreement that conflict with the Broker Protocol and/or state and federal law are void and unenforceable.

## THIRD CLAIM FOR RELIEF

**(Imposition of Unlawful Terms and Conditions of Employment)**

51. Plaintiffs restate and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

52. Labor Code § 432.5 states that no employer "shall require any employee or applicant to agree, in writing, to any term or condition which is known by such employer . . . to be prohibited by law."

53. California Business and Professions Code § 16600 prohibits contracts that restrain anyone from engaging in a lawful profession, trade, or business.

54. Government Code § 12964.5 makes it unlawful for an employer, in exchange for a raise or bonus, or as a condition of employment, to require an employee to sign a non-disparagement agreement or other document that purports to deny the

employee the right to disclose information about unlawful or potentially unlawful conduct.

55. Rule 21F-17 of the Securities and Exchange Commission states that "no person may take any action to impede an individual from communicating directly with the [SEC] about a possible securities law violation, including enforcing, or threatening to enforce, a confidentiality agreement."

56. As detailed above, Defendant, through its non-disparagement, non-solicitation, and confidentiality provisions, requires employees to agree in writing to terms and conditions which Defendant knows, or should know, are prohibited by the above laws.

57. As a result of Defendant's unlawful conduct as alleged herein, Plaintiffs have sustained damages.

## **PRAYER FOR RELIEF**

Plaintiffs therefore pray for relief as follows:

1. For a declaratory judgment and temporary injunctive order finding that:
   a. Invoking the protections of the Broker Protocol does not misappropriate any of Defendant's protectable trade secrets or violate the Defend Trade Secrets Act;
   b. Plaintiffs will not breach any enforceable provision of their agreements with Defendant by invoking the protections of the Broker Protocol;
   c. Defendant is not entitled to a temporary restraining order, preliminary injunction, permanent injunction or other injunctive or monetary relief against Plaintiffs if they choose to invoke the protections of the Broker Protocol;
   d. Defendant's employment agreements are illegal, unconscionable, void, and unenforceable in their entirety; and, alternatively,
   e. Those sections within Defendant's employment agreements purporting to define Defendant's trade secrets to include Protocol Information,

13
COMPLAINT

    and to prohibit solicitation of clients using Protocol Information, are void and unenforceable.

2. For compensatory damages in an amount according to proof;

3. For pre-judgment interest and post-judgment interest at the statutory rate;

4. For attorneys' fees and costs of suit; and

5. For such other relief as the Court deems just and proper.

DATED: January 19, 2021   Submitted by,

SHUSTAK REYNOLDS & PARTNERS, P.C.
ERWIN J. SHUSTAK, ESQ.
KATHERINE S. BOWLES, ESQ.

*[signature: Katherine Bowles]*

401 West "A" Street, Suite 2200
San Diego, CA 92101
Telephone: (619) 696-9500
Facsimile: (619) 615-5290

*Attorneys for Plaintiffs Diana Wolf and Rahamin Suares*